# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD R. VALENTINE,<br><br>　　　　　　　　　Plaintiffs,<br><br>v.<br><br>KRISTJEN NIELSEN, Secretary, Department of Homeland Security (Customs and Border Protection),<br><br>　　　　　　　　　Defendant. | Case No.: 16-cv-2357 W (KSC)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. 37]** |

　　Pending before the Court is Defendant Kristen Nielsen, Secretary of the Department of Homeland Security (Customs and Border Protection)'s motion for summary judgment. Plaintiff Richard R. Valentine opposes the motion.

　　The Court decides the matter on the papers submitted and without oral argument. See Civ. L.R. 7.1(d)(1). For the following reasons, the Court **GRANTS** Defendant's motion [Doc. 37].

//

//

## I. BACKGROUND

On July 14, 2008, Plaintiff Richard R. Valentine began a two-year internship with U.S. Customs and Border Protection ("CBP") as an Agricultural Specialist under the Federal Career Intern Program ("FCIP"). (*Compl.* [Doc. 1] ¶ 5; *Def's Ex. 2* [Doc. 37-9] p. MSJ_051.[1]) According to Valentine's employment agreement, during the two-year period, "the Intern's performance, development, conduct and general suitability for continued employment will be assessed." (*Def's Ex. 2* p. MSJ_051.) The agreement further provided that there "is no guarantee or entitlement to conversion" to a career appointment. (*Id.*)

Valentine was assigned to work at the Port of Otay Mesa Cargo Facility. His job duties included inspecting agricultural shipments entering the United States for pests, diseases, and contraband.

On March 14, 2010, Agricultural Specialist Paul Balistocky instructed Valentine to inspect a truckload of fruits and vegetables arriving from Mexico. (*Compl.* ¶ 7; *Def's Ex. 11* [37-16] p. MSJ_107.) From a service counter approximately 50 feet away, Valentine's second-line supervisor, Branch Chief Rosalinda Maizuss, watched him conduct the inspection. (*Def's Ex. 9a* [37-14[2]] p. MSJ_096.)

When Valentine arrived at the dock, the truck's driver was standing next to approximately 10 different samples of vegetables and fruits the driver had chosen to be inspected. (*Def's Ex 1a* [Doc. 37-5] pp. MSJ_009–010; *Def's Ex. 9a* p. MSJ_094.) Valentine spoke to the driver, looked down at the samples, looked back at the paperwork

---

[1] Documents referred to as "*Def's Ex.*" are attached to Defendant's notice of lodgment filed in support of the motion [Doc. 37-4]. Documents referred to as "*Def's Reply Ex.*" are attached to Defendant's notice of lodgment filed in support of the reply [Doc. 40-1]. Documents referred to as "*Pl's Ex.*" are attached to Plaintiff's notice of lodgment filed in support of the opposition [Doc. 39-2].

[2] The electronic version of certain defense exhibits is broken into subparts. For example, Def's Ex. 9 consists of Exs. 9a [Doc. 37-14] and 9b [Doc. 37-15]; Def's Ex. 1 consists of 1a [Doc. 37-5], 1b [Doc. 37-6], 1c [Doc. 37-7] and 1d [Doc. 37-8].

in his hand and then walked away. (*Def's Ex. 9a* p. MSJ_094.) Valentine's inspection of these fruits and vegetables took two to three minutes, during which he did not physically inspect any of the commodities. (*Def's Ex. 1a* p. MSJ_11; *Def's Ex. 10* [Doc. 37-16] p. MSJ_105.) Valentine claims he then went inside the truck's unlit trailer to inspect corn that was stacked in wooden crates. (*Def's Ex. 1a* pp. MSJ_011–012.) He did not remove any of the corn from the crates, but using a flashlight, claims he inspected the corn by "manipulating" it through the crate's wooden slats. (*Id.* pp. MSJ_011–012.) Valentine's inspection of the corn took about one to two minutes. (*Id.* p. MSJ_012.)

The next day, Chief Maizuss asked Valentine to write a memo justifying the visual inspection of the commodities on the dock. (*Def's Ex. 9a* p. MSJ_094.) Valentine wrote, in relevant part:

> As I walked to the truck I reviewed the manifest and confirmed that the shipment contained only commodities that are permitted to enter into U.S. commerce, and noted that they were all a "low risk" of actionable pest infestation according to my experience. I also noted that the truck was a low risk of Narcotics smuggling because it had already had its NII done, and was cleared. As I reached the truck I engaged the driver to assess his attitude/nervousness, and judged him to be behaving normally because he is a regular driver whom I am accustomed to seeing. At this point I visually confirmed the commodities listed on the manifest were present. I also visually confirmed that these "low risk" commodities were free from insect damage, looking at each in turn and stepping a few pallets deep into the trailer to confirm my conclusions on that point.

(*Def's Ex. 11* p. MSJ_107.) Unsatisfied with Valentine's justification for his visual inspection, Chief Maizuss then asked him to respond in writing to six questions regarding the inspection. (*Def's Ex. 13* [Doc. 37-16] p. MSJ_111.) Valentine responded on or about March 20. (*Def's Ex. 12* [Doc. 37-16] p. MSJ_109.)

The March 14 incident was not the first time Chief Maizuss witnessed Valentine fail to follow inspection procedures. On July 22, 2009, Chief Maizuss verbally counseled Valentine for "failing to perform intensive exams on a total of 8 ATU targeted manifests… ." (*Def's Ex. 9a* p. MSJ_099.)

3

On or about June 14, 2010, Chief Maizuss prepared a 22-month Proficiency Certification Report ("PCR") for Valentine, in which she recommended that Valentine not be converted to a career employee at the end of his internship. (*Def's Ex. 15* [37-18] p. MSJ_123.) According to the PCR,

> Valentine has been retrained on several elements and still needs direction, for example on correctly completing narratives/incident reports, 591's, tailgate inspections and on utilizing PPE's appropriately. CBPAS Valentine <u>has not</u> followed procedure with respect to correctly logging intensive inspections.

(*Id.*) Port Director Rosa Hernandez concurred with Chief Maizuss's PCR, and forwarded it to the Director of Field Operations, Paul Morris. On July 12, 2010, two days before the end of Valentine's internship, Morris sent Valentine a letter terminating his employment. (*Def's Ex. 16* [Doc 37-18] p. MSJ_125.) In support of the decision, Morris cited Chief Maizuss's observation that Valentine violated CBP policy during his March 14, 2010 inspection. (*Id.*) The letter also noted that Valentine had "been re-trained on several elements of your performance, and still fail to follow correct procedures," and further stated that he had been untruthful in responding to some of Chief Maizuss's inquiries regarding the inspection. (*Id.*)

On July 20, 2010, Valentine filed a complaint with the Merit Systems Protection Board ("MSPB"). (*Def's Ex. 14* [Doc. 37-17].) His complaint disputed that the March 14 inspection violated CBP policy, and he asserted that he passed all of the training elements (some after retraining). (*Id.* p. MSJ_117.)

Eventually Valentine retained counsel, and on or about August 15, 2010, he filed an Individual Complaint of Employment Discrimination. (*Def's Ex. 17* [Doc. 37-18].) Valentine alleged his termination was the result of discrimination based on his race, color and national origin, and retaliation. (*Id.* p. MSJ_129.) On or about September 13, 2013, the EEO Administrative Judge granted the CBP's summary-judgment motion. (*Def's Ex. 20c* [Doc. 37- 31] p. MSJ_234.)

On September 19, 2016, Valentine filed this lawsuit alleging causes of action for (1) discrimination based on race, color, ancestry and/or national origin, and (2) reprisal for prior EEO activity. (*See Compl.*) On December 5, 2017, this Court granted Valentine's motion to dismiss the second cause of action for reprisal for prior EEO activity. (*See Dismissal Order* [Doc. 21].) Defendant now moves for summary judgment on the remaining discrimination cause of action.

## II. **LEGAL STANDARD**

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot avoid summary judgment merely by demonstrating "that there is some metaphysical doubt as to

the material facts." In re Citric Acid Litig., 191 F.3d 1090, 1094 (9th Cir. 1999) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Ford Motor Credit Co. v. Daugherty, 279 Fed. Appx. 500, 501 (9th Cir. 2008) (citing Celotex, 477 U.S. at 324). Additionally, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587.

## III. DISCUSSION

The Supreme Court has established a three-stage burden shifting test to analyze claims of employment discrimination under Title VII. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). First, the employee bears the initial burden of demonstrating the prima facie elements of his discrimination claim. Id. at 802. Once the plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir. 1993). Finally, the burden shifts back to the employee to prove that the proffered reason for termination was actually a pretext to hide unlawful discrimination. Id. The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 659 (9th Cir. 2002).

In order to establish his prima facie case of discrimination, Valentine needs to show that: (1) he suffered an adverse employment action; (2) he was performing his job in a satisfactory manner; and (3) his termination occurred under circumstances giving rise

6

to an inference of race discrimination. Goodwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998). For the reasons that follow, the Court finds Valentine cannot establish any of the elements of his prima facie case.

### A. Adverse Employment Action

To establish that he suffered an adverse employment action, Valentine must demonstrate that he suffered a "materially adverse change in the terms or conditions of employment because of the employer's actions." Michael v. Caterpillar Fin'l Services Corp., 496 F3d 584, 593 (6th Cir. 2007). Employer actions such as "firing, failing to promote… or a decision causing a significant change in benefits" indicate tangible employment action. Burlington Industries v. Ellerth, 524 U.S. 742 (1998).

Here, Valentine's ability to establish that he suffered an adverse employment action depends on whether the CBP's decision not to convert his FCIP internship to a career appointment constitutes a materially adverse change in the terms or conditions of his employment. For at least three reasons, the Court finds it does not.

First, the Executive Order creating the FCIP and the federal regulation implementing the program state that "service as a career intern confers no rights to further Federal employment in either the competitive or excepted service upon expiration of the internship period." Executive Order No. 13,162; 5 C.F.R. § 213.302(o)(6)(2006). Subsection 4 of the Executive Order also states that "[c]ompetitive civil service status *may* be granted to a Career Intern." Executive Order No. 13,162 (emphasis added). The implementing regulation then reiterates:

> As a condition of employment, the appointment of a career intern expires at the end of the 2-year internship period.... If an employee is not converted to a career or career-conditional appointment, the career intern appointment terminates....

5 C.F.R. § 213.3202(o)(7)(2006). These regulations support a finding that the decision not to convert Valentine's internship did not constitute an adverse employment action.

7

Second, relying on these regulations, courts have held that an agency's decision not to convert an FCIP appointee to a permanent position does not qualify as an adverse employment action. See Lee v. Merit Systems Protection Board, 857 F.3d 874, 875 (Fed. Cir. 2017) (explaining that an "agency's decision not to convert an FCIP intern to competitive service is not an 'adverse action'... because the implementing regulations clearly explain that interns have no right to further federal employment after their appointments expire"); Rocha v. Merit Systems Protection Bd., 688 F.3d 1307, 1311 (Fed. Cir. 2012) (explaining that because plaintiff had no "right to further federal employment when his FCIP appointment ended… the State Department's decision not to convert his appointment to a competitive service position was not an 'adverse action'"); Scull v. Dep't of Homeland Sec., 113 M.S.P.R. 287, 291 (2010) (explaining that "an FCIP intern's termination upon the expiration of his appointment is generally not an adverse action because it merely carries out the terms of the appointment"). Significantly, Valentine has not cited a single case disagreeing with these cases. Case law, therefore, also supports a finding that Valentine cannot establish an adverse employment action.

Third, Valentine's signed employment agreement explicitly limited his appointment to a two-year period. (*Def's Ex. 2* p. MSJ_051.) The agreement further stated:

> The position being offered to you is under the Federal Career Intern Program (FCIP) and is in the excepted service (Schedule B). These appointments are time-limited and will not exceed 2 years (plus any approved extensions) unless a decision is made to convert you to a competitive service position at the end of the 2-year period.

(*Id.*) In short, the employment agreement, like the Executive Order and the Federal regulations governing the FCIP, reiterated that Valentine's service as an intern gave him "no guarantee or entitlement to conversion." (*Id.*) Accordingly, the CBP's decision not to convert Valentine to a career appointment, and instead to terminate him, did not qualify as a decision that adversely affects his employment conditions.

8

Because Valentine cannot establish the first element of his prima facie case, Defendant is entitled to summary judgment.

### B. Performing in a Satisfactory Manner

Defendant argues that Valentine cannot establish that he was performing his job in a satisfactory manner based on Chief Maizuss's observations of his inspection on March 14, 2010. In his opposition, Valentine attempts to establish that he was performing his job satisfactorily by (1) asserting Defendant applied the wrong standard in evaluating his inspection and (2) disputing some of Chief Maizuss's criticisms of the inspection. The Court is unpersuaded by Valentine's argument.

First, Valentine's contention that Maizuss used the wrong standard to judge his inspection is unavailing for at least two reasons. As Defendant points out in its Reply, Valentine has not designated an expert to testify regarding the proper standard governing his inspection, nor is there any indication Valentine possess the experience, training, and education needed to offer an opinion on the issue. (*Reply* [Doc. 40] 8:1–5.) In contrast, Defendant has designated Leslie Gomez-Montez as a non-retained expert to establish the proper procedures and standard that applied to Valentine's March 14 inspection. (*See P&A* [Doc. 37-1] p. 4, n.27; *Gomez-Montez Dec.* [Doc. 37-2].) Gomez-Montez has been employed with CBP since 2002, and is currently an Agriculture Operations Manager in the San Diego Field Office. (*Gomez-Montez Dec.* ¶ 2.) Since September 2009, she has been an Agriculture Operations Manager, which is responsible for oversight of the CBP agriculture quarantine inspection (AQI) program at the ports of entry within the San Diego Field office area of responsibility. (*Id.*) Her duties include providing advice to the San Diego Field Office ports of entry on the inspection of, among other things, commercial shipments. In short, unlike Valentine, Defendant has provided support for its contention regarding the standard that governed Valentine's March 14 inspection.

Moreover, notwithstanding Valentine's argument, the evidence establishes that Defendant and Valentine used the same standard to evaluate Valentine's visual inspection

9

of the commodities on the dock.  Valentine contends that his visual inspection was appropriate because all of the commodities were "low risk" under the "USDA NARP program." (*Def's Ex. 11* p. MSJ_107; *Pl's Ex. 1* [Doc. 39-3] p. 288.)  Defendant's expert, Gomez-Montez, also used NARP (the National Agriculture Release Program) to evaluate whether Valentine's visual-only inspection of the commodities on the dock was appropriate.  (*Gomez-Montez Dec.* ¶¶ 4–7, citing *Def's Ex. 6* [Doc. 37-12] and *Def's Ex. 7* [Doc. 37-13].)  For this additional reason, Valentine's contention that Defendant uses the wrong standard to evaluate his inspection lacks merit.

Second, contrary to Valentine's argument, the undisputed evidence confirms Valentine did not conduct a proper inspection on March 14, 2010.  Although he disputes some of Chief Maizuss's observations of the inspection, he does not dispute failing to physically inspect any of the fruits and vegetables on the dock.  (*Def's Ex. 1a* pp. MSJ_009–011; *Def's Ex. 10* p. MSJ_105.)  Instead, Valentine attempts to justify his visual-only inspection by asserting that the commodities were *all* "low risk." (*Def's Ex. 11* p. MSJ_107.)  The evidence does not support Valentine's assertion.

As established by the manifest, the commodities on the dock included California chili peppers, habanero chili peppers, jalapeno chili peppers, pasilla chili peppers, sweet corn, cactus leaf, and husk tomatoes.  (*Def's Ex. 5* [Doc. 37-12] pp. MSJ_068–069.)  According to the NARP Guidelines, none of these commodities were considered "low risk" and, therefore, a sample of each had to be physically inspected.  (*Gomez-Montez Dec.* ¶¶ 4–7, citing *Def's Exs. 6, 7*.)  Moreover, because these commodities were commingled with commodities that otherwise would have been considered "low risk" (i.e., the Roma tomatoes, cucumbers, bell peppers, chayotes and squash), the NARP Guidelines required Valentine to also inspect a sample of these commodities.  (*Id.* ¶¶ 4, 5.)  In short, under NARP, Valentine was required to conduct a physical inspection of a sample of all the commodities on dock.  This required Valentine to touch and examine samples for signs of pests and disease, and required him to cut open samples of the chili peppers that were not "low risk." (*Id.* ¶ 7.)  Valentine admittedly did not conduct such an

inspection and, therefore, there is no dispute he failed to conduct an appropriate inspection on March 14, 2010.

Also undisputed is that the March 14 inspection was not the first time Valentine failed to follow inspection procedures. On July 22, 2009, Chief Maizuss verbally counseled Valentine for "failing to perform intensive exams on a total of 8 ATU targeted manifests…." (*Def's Ex. 9a* p. MSJ_099.) Based on these undisputed facts, the Court finds Valentine has failed to establish that he was satisfactorily performing his job duties. For this additional reason, Defendant is entitled to summary judgment.

### C. **Inference of Intentional Discrimination**

To establish his prima facie case, Valentine also must present specific and substantial evidence that gives rise to an inference of intentional discrimination. Washington v. Garrett, 10 F.3d 1420, 1433 (9th Cir. 1993). In support of this element, Valentine raises only one argument that he supports by citing evidence. Relying on an incident in 2009, Valentine contends that Chief Maizuss treated other Agricultural Specialists who "were neither Caucasian nor American" more favorably than she treated Valentine:[3]

> Further evidence of Chief Rosalinda Maizuss, Plaintiff's supervisor, treating other Agriculture Specialists more favorably that [sic] she was treating Plaintiff was testified to by her in her deposition wherein she confirmed under oath that she intentionally did not place evidence of similarly situated Agricultural Inspectors' failures to conduct inspections and not following protocol, which she considered to be an integrity issue, in their records because she did not want them to be fired. Those other inspectors all of whom were neither Caucasion or American, were Emily

---

[3] Although Valentine does not identify when the alleged incident occurred, the exhibits establish that it was in 2009. According to Chief Maizuss's deposition transcript, the incident involved his failure on 8 ATUs or exams. (*Pl's Ex. 24* [Doc. 39-3] p. 64:18–19, and p. 2 of the attached deposition exhibit 11.) In her declaration, Chief Maizuss stated that she verbally counseled Valentine for failing to perform intensive exams on the 8 ATUs on July 22, 2009. (*Def's Ex. 9a* p. MSJ_099.) Thus, the "incident" regarding the 8 ATUs occurred before July 22, 2009.

11

Garcia, Hispanic, who failed to examine 5 ATU targeted shipments, Amir Bashtushari, middle eastern, who failed to examine 13 ATU targeted shipments and Charles Chilicutt, non-Caucasion-American who failed to examine 16 ATU targeted shipments. (PLE 24 Maizuss' deposition transcript entire pages 64, 65 and 66 and Exhibit 11 to her deposition).

(*Opp.* [Doc. 39] 19:22–20:7.) The problem with this argument is that it is not supported by the evidence—i.e., Chief Mazuss's deposition transcript—cited by Valentine.

According to the deposition transcript, because Chief Maizuss was a brand new chief, after witnessing the four specialists fail to conduct intensive exams and follow protocol, she asked her boss, "Mr. Fanning," how to proceed. (*Pl's Ex 24* [Doc. 39-3] p. 65:8–24, p. 66:15–18[4].) Mr. Fanning suggested counseling each one individually, "because there's no sense in firing all of them." (*Id.* pp. 65:25–66:3.) Chief Maizuss followed Mr. Fanning's guidance and gave them *all* verbal counseling. (*Id.* p. 66:19–23.) Thus, Chief Maizuss's deposition transcript demonstrates that she treated the four Agricultural Specialists the same.

Moreover, in a portion of the transcript Valentine omits from his opposition, Chief Maizuss confirmed that she treated the four specialists the same:

> Q   Did you do similar verbal counseling for the other persons that you mentioned?
> A   They were all the same
> Q   Did you include them all in their files? This ended up in Mr. Valentine's file. Did all the rest end up in their files?
> A   Yes.

(*Def's Reply Ex. 22* [Doc. 40-2] MSJ_247.)

Because Valentine has not presented substantial and specific evidence giving rise to an inference of intentional discrimination, he cannot establish an inference of

---

[4] Valentine did not number his exhibits. Page references to his Exhibit 24 are to the deposition transcript page number.

intentional discrimination. For this additional reason, Defendant is entitled to summary judgment.

IV. **CONCLUSION & ORDER**

For the reasons discussed above, the Court finds Valentine cannot establish any of the three elements of his prima facie case. The Court, therefore, **GRANTS** Defendant's summary-judgment motion [Doc. 37].

**IT IS SO ORDERED.**

Dated: August 28, 2018

Hon. Thomas J. Whelan
United States District Judge